STATE of Missouri, Respondent,

v.

Theodore L. IRVING, II, Appellant.

No. WD 37110.

Missouri Court of Appeals,
Western District.

May 27, 1986.

Motion for Rehearing and/or Transfer to Supreme Court Denied June 26, 1986.

Application to Transfer Denied
Sept. 16, 1986.

Robert G. Duncan, Kansas City, for appellant.

William L. Webster, Atty. Gen., John M. Morris, Asst. Atty. Gen., Jefferson City, for respondent.

Before MANFORD, P.J., and PRITCHARD and TURNAGE, JJ.

TURNAGE, Judge.

Theodore L. Irving, II was charged with promoting prostitution in the second degree in violation of § 567.060, RSMo 1978. The jury found Irving guilty and upon a finding by the court that he was a prior offender, sentencing was left to the court. The court imposed sentence of seven years imprisonment and a fine of $5,000.

Irving contends the evidence was insufficient to support a conviction, the court erred in the giving of an instruction, the information was insufficient, and the court improperly restricted cross-examination. Affirmed.

Irving was charged with promoting prostitution between October 1, 1983 and June 7, 1984 by controlling a prostitution business. The evidence revealed the business was known as the V.I.P. Health Studio and Massage Parlor located on Truman Road in Jackson County. The business was incorporated under the name of Gentlemen's Quarters with Irving as the sole stockholder. Irving obtained a license for the V.I.P. for the operation of a massage parlor for the year 1983.

In October 1982 Irving was convicted in federal court of attempted income tax evasion. During the period of October 1, 1983 to June 7, 1984 he was confined in the Federal Penitentiary in Leavenworth. He was housed in the Federal Penitentiary Camp in Leavenworth, located outside of the main penitentiary.

In December of 1983 Irving applied for a license to operate the V.I.P. for the year 1984. On the application he listed his mother, Juanita Irving, as a partner in the business. He also listed 21 girls who were employed at the V.I.P. Juanita also filed an application for the operation of the V.I.P. for the year 1984. On this application Juanita listed her son, Theodore L.

Irving, II, as a partner in the business. She listed most of the 21 girls that were named in Theodore's application. The business operated from December 31, 1983 until April 2, 1984 under the license issued to Irving for the year 1983 because a decision had not been reached as to whom a license would be issued for 1984. On April 2, 1984 a license was issued to Juanita and the application filed by Irving was rejected because of his federal conviction.

The state produced two men who testified that they had been customers at the V.I.P. between October of 1983 and June of 1984. Their descriptions of their visits to V.I.P. were practically identical. On entering the V.I.P., the customer was given a menu which listed and described the various massages and the cost of each. Both customers testified that they ordered the "his and her" at $70 on most of their visits. After choosing a massage a female operator escorted the customer to a room with a hot tub. The customer and operator both undressed and then got into the tub. While in the tub the operator washed the upper part of the customer's body. After a half hour the operator directed the customer to lie down on a mattress. The operator massaged the back, arms and legs of the customer. The operator then asked the customer if he wanted to massage the operator. The customer would massage the operator but would not touch the pubic area. In some instances the customers would massage the breasts of the operator but this appeared to be optional with the operator. The customer was then requested to lie on his back and the operator massaged the front of the customer. The two customers testified that each massage included masturbation of the customer by the operator.

A private investigator who was working for the Platte County Sheriff went to the V.I.P. at the request of the sheriff. He testified to the same procedure as described by the two customers. The investigator said that he received masturbation on three out of five visits. He further identified five girls who were working at the V.I.P.

Carolyn Duncan testified that she went to the V.I.P. in late September of 1983 to apply for a job. She was referred to a girl named Tassy for training to pass the test for those employed in massage parlors. About two weeks after she applied she took and passed the test. On Duncan's first day on the job at the V.I.P. she assisted the girl called Tassy in giving a massage to a customer. After they had each massaged a side of the customer Tassy pointed to his genital area and told Duncan to finish up. Duncan thereupon masturbated the customer. Duncan later asked Tassy if that was a part of all massages and Tassy told her it was. She said Tassy told her that it was legal because they had been doing it for 12 years and that it was not prostitution.

Duncan further testified that in October of 1983 she was giving a massage when she was called to the telephone. She said the call was on a red phone which was used only for incoming calls. A sign nearby announced that only collect calls from Ted were to be accepted. Duncan said the caller identified himself as Ted and told her that she had forgotten to write the time and room number on the board before she started her massage. Duncan testified that for safety reasons there was a board on which each operator was to write the time and the room number when they began a massage. Duncan said that she told Ted that she had forgotten to make the entry on the board and he told her to not let it happen again. There was evidence of many calls to the V.I.P. from the Leavenworth camp where Irving was incarcerated.

A guard from the Leavenworth camp testified that part of his duty was to monitor phone calls placed by inmates. This was done by means of a loud speaker over which the guard could hear the inmates side of the conversation, but could hardly hear the voice of other parties. The guard testified that in April of 1984 he heard Irving talking with Tassy. Irving said the girls were not to take sauna baths while on duty and that they would have to adhere to

that policy or be let go. Irving also talked with "mom" and told her the girls would not have to shave their legs in order to be ready and it was not mandatory that they wear panty hose. He also said a watchman would open and close the doors at certain times. There was also a discussion about advertising in the yellow pages and about some demand for a police payoff concerning the Shangri-La. After that discussion Irving said "we will just shut the doors." As a result of those calls Irving was given a conduct violation for running a business.

There was evidence that one of the girl operators told a customer that the business was owned by Ted Irving who was in the Leavenworth Penitentiary. Tassy told Duncan when she started to work that the V.I.P. was owned by Ted. There was evidence that Irving owned the real estate where the V.I.P. was located until he gave his mother a quit-claim deed in November of 1984.

The female operators collected the fee from each customer and retained 40 per cent for their share. Some of the girls wrote on their sheets that the other 60 per cent was Ted's money. The sheets containing information as to the amount of money collected together with the 60 per cent were dropped in a safe to which only Juanita had access.

Irving first contends the evidence was insufficient to show that he controlled a prostitution business. His principle contention seems to be that it was impossible for him to control the business because he was in federal custody during the period involved.

Section 567.010(1) defines "promoting prostitution" to be when a person knowingly provides persons or premises for prostitution purposes, operates or assists in the operation of a house of prostitution or a prostitution enterprise, or engages in any conduct designed to institute, aid or facilitate an act or enterprise of prostitution. Section 567.010(2) defines "prostitution" as offering, agreeing or engaging in sexual conduct with another person in return for something of value. Section 567.010(4)(c)

defines "sexual conduct" as any touching, manual or otherwise, of the genitals of one person by another, done for the purpose of arousing or gratifying sexual desire of either party.

Section 567.060 provides that a person commits the crime of promoting prostitution in the second degree if he knowingly manages, supervises, controls or owns, either alone or in association with others, a house of prostitution or prostitution business or enterprise involving prostitution activity by two or more prostitutes.

■ The thrust of Irving's argument is that he did not control a prostitution business. He states that the word "control" is a generic term which has many meanings. While it is true the word "control" may be used in a number of ways, the only direct application of that word to the facts in this case is the definition of "power or authority to guide or manage." *Webster's Third New International Dictionary*. Thus, the question is whether or not the evidence was sufficient to allow the jury to find that Irving had the power or authority to guide or manage the V.I.P. Without repeating the facts set out above, it is apparent the evidence was sufficient. Irving was referred to as the owner and from October 1, 1983 to April 2, 1984 the business operated under a license issued to him. The business operated after that date under a license issued to Juanita but with Irving listed as a partner in the business. Beyond that the evidence showed Irving's close supervision and control. Irving maintained his control at least in part through numerous phone calls. While Duncan was not acquainted with Irving the jury was entitled to infer that the "Ted" who called Duncan was Irving. This was a permissible inference based upon the evidence of Irving's past ownership of the business and his continued interest and management of the business by telephone. The evidence was overwhelming that the V.I.P. was a prostitution business and the only question Irving raises is whether or not the evidence showed that he controlled the business. From the evidence the jury was entitled to

find that Irving did control the business even though he was incarcerated at Leavenworth.

■ Irving next complains that the court gave an instruction patterned after MAI–CR2d 2.12 which told the jury that Irving was responsible for the conduct of others if he acted with them or aided or encouraged them in committing the offense. Irving contends that he was charged with acting alone and therefore it was error to instruct on the conduct of others. It is proper to submit MAI–CR2d 2.12 even if the information does not charge a person as an aider or abettor. If the evidence warrants such a submission, the jury can be properly instructed to find a person guilty on either active participation or for aiding and abetting. *State v. Barnes*, 693 S.W.2d 331, 333[8] (Mo.App.1985). Here the evidence was that Irving controlled the business through those who were physically located at the V.I.P. Thus, the evidence supported a finding that Irving controlled the business by aiding and abetting those who were working at the V.I.P. in the operation of a prostitution business.

■ Irving also attacks the use of the word "controlled" in the instruction. The instruction allowed the jury to find Irving guilty if it found that he controlled, in association with others, a prostitution business. Irving contends the word "controlled" is such a broad term that it gave the jury a roving commission. It is well settled that if an instruction employs words of common usage no definition of such terms is required. However, technical terms, those whose meaning may not be comprehended readily by unprofessional persons and which the jury might misapply, must be defined. *State v. Ogle*, 627 S.W.2d 73, 76[5] (Mo.App.1981). Here the word "controlled" is a word of common usage and, as stated above, in the context of this case would mean the power or authority to manage the business. The jury would have no difficulty in applying that term to the facts of this case and since control is used in its ordinary sense, such term was not required to be defined.

■ Irving next contends the information was insufficient. Irving again focuses on the word "control." The information charged that Irving "knowingly promoted prostitution by controlling a prostitution business." As discussed above the word "controlled" in the context of the information means power or authority to guide or manage. The information was not deficient because of the use of the word "control."

■ Further, an information in the language of the statute is ordinarily sufficient to charge an offense. *State v. Taylor*, 651 S.W.2d 603, 606[5] (Mo.App.1983). Beyond that Irving did not file a request for a bill of particulars pursuant to Rule 23.04. This precludes his challenge that the information is imperfect. *State v. Lewis*, 642 S.W.2d 627, 630[3] (Mo. banc 1982).

■ Irving finally contends that the court deprived him of effective cross-examination of the two customers. The customers each testified that the masturbation administered by the operator was sexually stimulating to them. Irving's counsel sought to cross-examine each customer on whether or not he had been sexually stimulated in other situations such as viewing pornographic movies. The state objected on the grounds of relevancy. The state was required to prove that prostitution was practiced at the V.I.P. which means proof of sexual conduct. Sexual conduct as defined in § 567.010(4)(c) is a touching of the genitals of one person by another for the purpose of arousing or gratifying sexual desire. Thus, the only question was whether or not the touching of the customer's genitals by the operators was for the purpose of arousing or gratifying the sexual desire of either the customer or operator. To carry this burden the state produced the testimony of the two customers that the touching was sexually stimulating to them. Thus, the only question presented concerned the state of sexual desire of the customer at the time of the touching by the operator at the V.I.P. Whether the customer had been sexually stimulated before

or after that time was not relevant to the question of whether or not the touching by the operator at the V.I.P. was done for the purpose of arousing the customer's sexual desire.

The permissible extent of cross-examination is a matter largely within the discretion of the trial court. *State v. Thompson,* 697 S.W.2d 575, 579[6] (Mo.App.1985). The refusal to allow cross-examination concerning other sexual experiences of the customer was not an abuse of discretion.

The judgment is affirmed.

All concur.